# EXHIBIT 3

GOLDBERG SEGALLA

Chad J. Layton | Partner
Direct 312.572.8422 | clayton@goldbergsegalla.com

June 2, 2026

**Via Email**
Evan J. Cronin
211 West Wacker Drive
Suite 120, Number 2217
Chicago, Illinois 60606
legal@cronintaxservices.com

**Re: Arbitration Pursuant to Service Contract, dated January 7, 2025**
Matter: Evan J. Cronin v. Upwork Inc. et al.
Case No.: 1:26-cv-03220

Dear Mr. Cronin,

As you know, Article XI of the Service Contract, executed by you and our client, Nishchal Basnyat, on behalf of Fractional Tax, Inc., contains an arbitration provision that requires all disputes between the parties to be referred to United States Arbitration & Mediation (USA&M) for arbitration, rather than litigation. I have attached a copy of the Service Contract for your reference.

The arbitration provision further includes a fee-shifting clause that entitles a party to recover its costs for suit, including reasonable attorneys' fees for having to compel arbitration, where the other party has failed to proceed with arbitration.

In light of these provisions, our clients intend to enforce their right to arbitration. However, to avoid unnecessary motion practice, please confirm whether you will agree to refer the matter to arbitration.

Please advise us of your position by **Tuesday, June 9, 2026, at 5:00 p.m.** If we do not receive confirmation, we will proceed with moving to compel the arbitration and seeking recovery of all fees incurred in prosecuting the Motion to Compel Arbitration.

Sincerely,

Chad J. Layton

Chad J. Layton/pp

*Attorneys for Terma Project, Inc., Fractional Tax, Inc., Fractional Tax USA, LLC, Chandler Murphy, and Nishchal Basnyat*

Enclosure: Service Contract

# FRACTIONAL TAX, INC.

# SERVICE CONTRACT

## I. PARTIES

This Service Contract ("Agreement") effective January 1, 2025, is by and between:

Evan J Cronin CPA & Tax Services ("Service Provider")
4753 N Magolia Ave, Unit 3
Chicago, IL 60640
evan@cronintaxservices.com

and:

Fractional Tax, Inc. ("FTINC")
14 Wall Street, 20th Floor,
New York City, NY 10005

Service Provider and FTINC are each referred to herein as a "Party" and, collectively, as the "Parties."

NOW, THEREFORE, FOR AND IN CONSIDERATION of the mutual promises and agreements contained herein, FTINC hires the Service Provider to work under the terms and conditions hereby agreed upon by the Parties.

## II. TERM

The term of this Agreement shall commence on **January 1, 2025**, and terminate on December 31, 2025.

**Termination without Cause**

FTINC may terminate this agreement, without cause, with thirty (30) days' written notice to the Service Provider.

**Termination for Cause**

The Company reserves the right to terminate this Agreement immediately, without prior notice, for cause. For purposes of this Agreement, "cause" shall include, but not be limited to:

1. **Failure to Perform:** Dereliction of duty, failure to perform the agreed-upon services, or repeated instances of substandard performance.

2. **Misconduct:** Any form of misbehavior, including but not limited to harassment, dishonesty, fraud, or other conduct deemed unprofessional or harmful to the Company or its reputation.

3. **Criminal Activity:** Involvement in any criminal activity, whether or not directly related to the services provided under this Agreement.

4. **Violation of Obligations:** Breach of any material term of this Agreement, including confidentiality, intellectual property, or compliance obligations.

5. **Failure to Meet Deadlines:** Persistent failure to meet deadlines or complete deliverables as agreed.

6. **Incapacity:** Inability, whether due to illness, injury, or other circumstances, to perform the services required under this Agreement.

7. **Disruption of Business:** Actions that disrupt or interfere with the normal operations of the Company.

Upon termination for cause, the Company shall have no further obligations to the Service Provider other than payment for services satisfactorily performed up to the termination date. The Service Provider shall immediately return all Company property, including confidential information, work products, and any other materials provided by the Company during the course of this Agreement.

This provision shall not limit the Company's right to pursue any additional remedies available under applicable law.

**Notice Requirement**: The Service Provider shall provide FTINC with no less than thirty (30) days' written notice prior to the termination of services under this Agreement. Failure to provide such notice shall be deemed a material breach of this Agreement.

**Good Faith Transition**: Upon termination of services, the Service Provider agrees to participate in a good faith transition to ensure the FTINC's continued operations are not disrupted. This includes, but is not limited to, providing necessary documentation, access to data, and cooperation with the Client and FTINC delegate or any successor provider during the transition period. The Service Provider is held accountable for their obligations while protecting FTINC from unnecessary disruptions or financial losses due to noncompliance.

**Recourse for Non-Compliance**:

- If the Service Provider fails to provide the required thirty (30) days' notice, FTINC shall have the right to:
  - Withhold final payment until notice is provided or an equitable resolution is agreed upon.
  - Seek reimbursement for any costs incurred due to the lack of notice, including but not limited to emergency replacement services or personnel or additional administrative costs.
- If the Service Provider fails to participate in a good faith transition, FTINC shall have the right to:
  - Seek damages equal to the costs incurred as a direct result of the Service Provider's non-compliance, including reasonable attorney's fees.
  - Pursue injunctive relief compelling the Service Provider to fulfill its transition obligations under this Agreement.

**Survival**: This provision shall survive termination of the Agreement and remain enforceable until the transition obligations are fully satisfied.

**III. SERVICES**

The Service Provider agrees to provide services, including but not limited to:

- FTINC client tax return preparation,
- FTINC client tax return and documentation review,
- FTINC client and prospective client tax and financial consultations (email/written, video conferencing, phone calls, live chat etc.)
- FTINC client representation before taxing authorities,
- FTINC client bookkeeping/write-up and review services, upon request,
- Training and development of FTINC team members, as appropriate,
- Research and draft tax technical memoranda on various tax issues, as necessary, for FTINC clients, and
- Oversee FTINC client engagements, projects and services as appropriate to ensure compliance and timely completion

Hereinafter known as the "Services." The Service Provider, while performing the Services, the Service Provider shall comply with all local, State, and Federal laws and to the best of his abilities and communicate with FTINC if there is something prohibiting him from performing these duties in accordance with all local, State, and Federal laws.

All platforms and applicable software for services above are to be provided by FTINC.

All services provided are tax and business consulting related and within the appropriate scope of practice for a Certified Public Accountant in the United States. No advice should be construed as general legal advice or advice regarding any specific financial security. Such advice should be obtained from an appropriately licensed attorney or SEC/FINRA registered investment adviser. FTINC is not, and does not operate as, a licensed CPA firm and no services should be provided to clients that would suggest to the client that FTINC is a licensed CPA firm.

**IV. PAYMENT**

FTINC agrees to pay the Service Provider the following:

- Hourly rate of $85 for every hour of phone calls, clients calls or meetings Service Provider provides to Clients or FTINC and/or

- Fixed Rate of either (i) 45% of the final service cost of every service completed by the Service Provider for FTINC Clients or (ii) an agreed upon payment between the Service Provider and the Company, agreed upon in writing. An example of the 45% fixed rate would be if the final service price is $1000, Service Provider would be compensated $450 for completing that service.

Hereinafter known as the "Payment Amount."

**V. PAYMENT METHOD**

FTINC shall pay the Payment Amount **through direct EFT/ACH within 10 business days after invoicing**, which will be presented twice per month on or around the 1st and 15th of every month for the prior period's total hours and services completed by Service Provider.

Invoices should be submitted by the Service Provider to payments@fractionaltax.com. The 15 business days will start after a complete and final invoice is submitted to FTINC.

**VI. CONFIDENTIALITY**

Service Provider acknowledges and agrees that all financial and accounting records, lists of property owned by FTINC, including amounts paid, therefore, client and customer lists, and any other data and information related to the FTINC's business is confidential ("Confidential Information"). Therefore, except for disclosures required to be made to advance the business of the FTINC and information which is a matter of public record, Service Provider shall not, during the term of this Agreement or after its termination, disclose any Confidential Information for the benefit of the Service Provider or any other person, except with the prior written consent of the FTINC.

A) **Return of Documents.** Service Provider acknowledges and agrees that all originals and copies of records, reports, documents, lists, plans, memoranda, notes, and other documentation related to the business of the FTINC containing Confidential Information shall be the sole and exclusive property of the FTINC and shall be returned to the FTINC upon termination of this Agreement or upon written request of FTINC.

B) **No Release.** Service Provider agrees that the termination of this Agreement shall not release him/her/they from the obligations in this Section.

**VII. INDEPENDENT CONTRACTOR STATUS**

Service Provider acknowledges that he is an independent contractor and is responsible for any and all taxes and other payments due on Payment Amount.

**VIII. SUCCESSORS AND ASSIGN**

The provisions of this Agreement **shall not be binding upon or inured to** the benefit of heirs, personal representatives, successors, and assigns of the Parties. Any provision hereof which imposes upon the Service Provider or FTINC an obligation after termination or expiration of this Agreement **shall survive termination or expiration** hereof and be binding upon the Service Provider or FTINC.

**IX. DEFAULT**

All services are provided solely by and through Evan Cronin. FTINC agrees no recourse can be pursued with any other affiliates, known or unknown, of Evan Cronin, and all recourse related to Services is limited to the amount of fees billed for such services.

**X. NO WAIVER**

No waiver of any provision of this Agreement shall be deemed or shall constitute a continuing waiver, and no waiver shall be binding unless executed in writing by the Party making the waiver.

**XI. ARBITRATION**

In the event a dispute shall arise between the Parties to this Agreement, it is hereby agreed that the dispute shall be referred to United States Arbitration & Mediation for arbitration in accordance with United States Arbitration & Mediation Rules of Arbitration. The arbitrator's decision shall be final and binding and judgment may be entered thereon. In the event a party fails to proceed with arbitration, unsuccessfully challenges the arbitrator's award, or fails to comply with arbitrator's award, the other party is entitled to recovery of costs of suit including a reasonable attorney's fee for having to compel arbitration or defend or enforce the award.

**XII. SEVERABILITY**

If any term, covenant, condition, or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.

XIII. **OWNERSHIP AND CONTROL; DELEGATION OF WORK**

The Service Provider hereby represents and warrants that it is and shall remain at all times fully owned and controlled by Evan Cronin. In the event that Evan Cronin delegates any portion of the Services to other individuals or entities within the Service Provider's structure, the Service Provider shall provide prior written notice to the Company, specifying the nature of the delegated work, the identity of the delegatee, and the expected duration of such delegation. Notwithstanding any delegation, Evan Cronin shall retain ultimate responsibility for the performance of the Services under this Agreement and shall ensure that all work performed by any delegatee complies fully with the terms and standards set forth herein."

**FTINC's Signature** DocuSigned by: Nishchal Basnyat 2064FE8E5EE54A4... **Date** 1/7/2025

Print Name Nishchal Basnyat

**Service Provider's Signature** Signed by: Evan J Cronin 7ADAA9742A98432... **Date** 1/7/2025

Print Name Evan J Cronin

# FRACTIONAL TAX, INC

## FORM OF NON-SOLICITATION AGREEMENT

THIS NON-SOLICITATION AGREEMENT (the "Non-Solicitation Agreement") is entered into by and between Fractional Tax, Inc. (henceforth, "Fractional Tax"), incorporated in the state of Delaware, and Evan J Cronin CPA & Tax Services to protect the valuable competitive information and business relationships of Fractional Tax.

**1. Acknowledgements.** I acknowledge and agree that:

a. In the course and scope of my engagement with Fractional Tax, I have developed or will develop unique relationships with Fractional Tax's clients, employees, contractors, partners, affiliates, customers, and suppliers.

b. I acknowledge that all work assigned to me by Fractional Tax will be conducted by me, personally, and will never, without exception, be assigned, delegated, or outsourced to any other individual, firm, corporation, or entity.

c. I am entering into this Non-Solicitation Agreement in conjunction with my participation and engagement with work relating to Fractional Tax and that this provides adequate and significant consideration for my willingness to enter into this Non-Solicitation Agreement.

**2. Non-Solicitation of Fractional Tax Employees and Contractors.**

During the term of my engagement with Fractional Tax and for twenty-four (24) months following the termination of my engagement for any reason (the "Non-Solicitation Period"), I agree that I will not, either on my own behalf or on behalf of any other person or entity, directly or indirectly, hire, solicit, retain, or encourage to leave the employ or contractor of Fractional Tax (or assist any other person or entity in hiring, soliciting, retaining or encouraging) any person who is then or was a contractor or employee of Fractional Tax.

**3. Non-Solicitation of Fractional Tax Clients.** During the term of my engagement—whether as a contractor, employee, or in any other capacity—at Fractional Tax and for twenty-four (24) months following the termination of my engagement for any reason (the "Client Non-Solicitation Period"), I agree that I will not, either on my own behalf or on behalf of any other person or entity, directly or indirectly, solicit any current or former clients of Fractional Tax with the intension of providing similar services to the client or with the intension of taking any business away from Fractional Tax. I acknowledge that Fractional Tax's relationships with its clients are extremely valuable to it and that the protection of Fractional Tax's relationship with its clients is essential.

**4. Survival.** The obligations contained in Paragraphs 2, 3 and 4 shall survive the termination of this Non-Solicitation Agreement. In addition, the termination of this Non-Solicitation Agreement shall not affect any of the rights or obligations of either party arising prior to or at the time of

termination of this Non-Solicitation Agreement, or which may arise by any event causing the termination of this Non-Solicitation Agreement.

**5. Waiver of Rights.** If on one or more instances either party fails to insist that the other party perform any of the terms of this Non-Solicitation Agreement, such failure shall not be construed as a waiver by such party of any past, present, or future right granted under this Non-Solicitation Agreement; and the obligations of both parties under this Non-Solicitation Agreement shall continue in full force and effect. Fractional Tax's waiver, for whatever reason, of the terms of a non-solicitation agreement between Fractional Tax and any other employee or contractor shall not operate as a waiver or release of my obligations under the Non-Solicitation Agreement and may not be used as evidence of Fractional Tax's intent to waive any of the terms of this Non-Solicitation Agreement.

**6. Remedies.** I acknowledge and agree that compliance with Paragraphs 2, 3 and 4 of this Non-Solicitation Agreement is necessary to protect the business and goodwill of Fractional Tax; and that a breach of Paragraphs 2, 3 or 4 will irreparably and continually damage Fractional Tax, for which money damages may not be adequate.

a. I agree that, in the event that I breach or threaten to breach any of these covenants, Fractional Tax shall be entitled to (i) a preliminary or permanent injunction in order to prevent the continuation of such harm; (ii) money damages insofar as they can be determined; and (iii) any other damages permitted by applicable law. Nothing in this Non-Solicitation Agreement, however, shall be construed to prohibit Fractional Tax from also pursuing any other remedy, the parties having agreed that all remedies shall be cumulative.

b. In addition to any money damages for the period of time during which I violate these covenants, Fractional Tax shall be entitled also to recover the amount of any fees, compensation, or other remuneration earned by me as a result of any such breach, as well as recovery of the consideration provided to me for entering into this Non-Solicitation Agreement.

**7. Attorneys' Fees.** In the event of any dispute or controversy arising under this Non-Solicitation Agreement, the prevailing party in any litigation or arbitration shall be entitled to recover from the other party the costs and expenses, including attorney's fees, incurred by the prevailing party related solely to the dispute or controversy.

**8. No Defense.** A claim by me against Fractional Tax shall not constitute a defense to Fractional Tax's enforcement of the restrictive covenants of this Non-Solicitation Agreement.

**9. Severability.** I acknowledge and agree that the parties have attempted to limit my right to solicit only to the extent necessary to protect the legitimate interests of Fractional Tax. If any provision or clause of this Non-Solicitation Agreement, or portion thereof, shall be held by any court of competent jurisdiction to be illegal, void or unenforceable in such jurisdiction, the remainder of such provisions shall not thereby be affected and shall be given full effect, without regard to the invalid portion. It is the intention of the parties and I agree, that if any court construes any provision or clause of this Non-Solicitation Agreement, or any portion thereof, to

be illegal, void or unenforceable because of the duration of such provision or the area or matter covered thereby, such court shall reduce the duration, area or matter of such provision and, in its reduced form, such provision shall then be enforceable and shall be enforced.

**10. Governing Law/Jurisdiction.** This Non-Solicitation Agreement shall be subject to and governed by the laws of the State of Delaware, without regard to its laws or regulations relating to conflict of laws. I hereby consent to the jurisdiction of, and agree that any claim arising out of or relating to this Non-Solicitation Agreement may be brought in any federal court or any state court of Delaware that has jurisdiction over such matters.

**11. Assignment.** This Non-Solicitation Agreement and any rights thereunder may be assigned by Fractional Tax and if so assigned shall operate to protect the Confidential Information and relationships of Fractional Tax as well as such information and relationships of the assignee.

**12. Applicability.** This Non-Solicitation Agreement shall be binding upon and shall inure to the benefit of the parties and their successors, assigns, executors, administrators, and personal representatives.

**{Signature Page – Next Page}**

**IN WITNESS WHEREOF,** the parties have caused this Non-Solicitation Agreement to be executed and delivered, effective as of the date signed below by a duly authorized officer of Fractional Tax.

Dated: 1/7/2025

Signature: Signed by: Evan J Cronin 7ADAA9742A98432...

Typed Name: Evan J Cronin

Address: 4753 N Magnolia Ave Unit 3
Chicago, IL 60640

Fractional Tax, Inc.

Signature: DocuSigned by: Nishchal Basnyat 2064FE8E5EE54A4...

Typed Name: Nishchal Basnyat

Address: 14 Wall Street, Fl 20
New York, New York 10005

# FRACTIONAL TAX, INC.

## NON-DISCLOSURE AGREEMENT

This Non-Disclosure Agreement (hereinafter the "Agreement") is made and entered into on 1/7/2025 by and between the Affiliated Companies, which included but are not limited to, Fractional Tax, Inc, incorporated in the state of Delaware (hereinafter the "Company"), and Evan J Cronin CPA & Tax Services (hereinafter "Counterparty").

FOR GOOD CONSIDERATION, and in consideration of Counterparty's engagement or continued engagement with the Company, Counterparty hereby agrees and acknowledges:

1. That during the course of my engagement, contract, and/or engagement with the Company, there may be disclosed to me certain trade secrets, confidential and/or proprietary business information of or regarding the Company; consisting of but not necessarily limited to:

a. Technical information: Sensitive financial and legal data of clients, estimates and/or projections. methods, processes, formulae, compositions. systems, techniques, inventions, machines, computer programs, research projects and experimental or developmental work, relating to any project or organization.

b. Business information: Business and development plans, investor and customer lists, social security information, EIN numbers, private client tax and accounting information, pricing data, sources of supply, financial data, marketing, production, and merchandising systems or plans and operation plans, investor transactions, stock and/or warrant ownership.

2. As used in this Agreement, the term "Confidential Information" means all Technical and/or Business information described in paragraphs 1(a) and (b) above, and any other trade secrets and/or confidential and/or proprietary business information of or regarding the Company (including information created or developed, in whole or in part, by Counterparty), which is not generally known about the Company or about its business. Confidential Information includes not only the information itself, but also all documents containing such information, and any and all such information maintained in electronic or other form. For purposes of this Agreement, Confidential Information shall not include any information which Counterparty can establish was (i) was publicly known or (ii) becomes publicly known and made generally available after disclosure to Counterparty by the Company, through means other than Counterparty's breach of his/her obligations under this Agreement.

3. Counterparty agrees that, except as necessary in performing the duties of his/her engagement with the Company, Counterparty shall not use in any manner, directly or indirectly, any Confidential Information. Counterparty agrees that he/she will never use any Confidential Information for his/her own benefit or for the benefit of any person or entity other than the Company, and will not permit or allow any Confidential Information to be used in competition with the Company. Counterparty acknowledges and agrees that all Confidential Information is the exclusive property of the Company, and Counterparty has no independent or individual claim

to such Confidential Information for any purpose. During his/her engagement with the Company and at all times thereafter, Counterparty shall take all reasonable steps to prevent any unauthorized disclosure or use of any and all Confidential Information. Counterparty further agrees to notify the Company immediately in the event that he/she becomes aware of any unauthorized use or disclosure of Confidential Information.

4. Counterparty understands and agrees that he/she is being engaged for an indefinite term, and the engagement with the Company can be terminated by either Counterparty or the Company at any time, for any reason, or for no reason at all, with or without advance notice.

5. All questions with regard to the interpretation and enforcement of any provision of this Agreement shall be determined in accordance with the laws of the State of Delaware.

6. I agree that upon the termination of my engagement from Company:

a. I shall return to Company all documents and property of Company, even if not marked “confidential” or “proprietary,” including but not necessarily limited to: drawings, blueprints, reports, manuals, correspondence, customer and/or investor lists, computer programs, and all other materials and all copies thereof relating in any way to Company’s business, or in any way obtained by me during the course of engagement. I further agree that I shall not retain copies. notes or abstracts of the foregoing.

b. The Company may notify any future or prospective employer or third party of the existence of this Agreement. The Company shall be entitled to injunctive relief for any or threatened breach of this Agreement, in addition to all other available remedies, including the recovery of monetary damages.

c. This Agreement shall be binding upon me and my personal representatives and successors-in-interest, and shall inure to the benefit of Company, its successors and assigns.

**Confidentiality and Intellectual Property**

This Non-Disclosure Agreement (NDA) shall remain in full force and effect throughout the period during which the Service Provider provides services to the Company and for a period of thirty-six (36) months following the termination of such services, regardless of the reason for termination. During this time, the Service Provider shall not disclose, use, or exploit any confidential information obtained during the course of their engagement with the Company for any purpose other than as expressly authorized in writing by the Company.

Any invention, discovery, design, development, improvement, concept, or work product (collectively, "Inventions") conceived, created, developed, or reduced to practice solely by the Company, or jointly by the Service Provider and the Company, during the term of the Service Provider's engagement, shall be the sole and exclusive property of the Company. The Service Provider agrees to assign and transfer all rights, title, and interest in such Inventions to the Company and shall execute any documents or take further actions reasonably requested by the Company to effectuate or protect the Company’s ownership rights.

This provision does not limit the Company’s rights to protect its trade secrets or other confidential information under applicable law, which may extend beyond the 36-month period where such information continues to meet the legal definition of a trade secret.

DocuSigned by:
Nishchal Basnyat
2064FE8E5EE54A4...

Authorized Company Signature

Signed by:
Evan J Cronin
7ADAA9742A98432...

Counterparty Signature

Nishchal Basnyat

Printed Name

Evan J Cronin

Printed Name

1/7/2025

Date

1/7/2025

Date

**FRACTIONAL TAX, INC**

**CONTENT ASSIGNMENT AND**

**USE OF NAME APPROVAL AGREEMENT**

As a condition and requirement of engaging in work for Fractional Tax, Inc, a Delaware corporation, and its assets (namely fractionaltax.com, and its various social media channels) and any of its current or future subsidiaries (whether or not wholly-owned), affiliates, successors, or assigns (collectively, the "Company"), and in consideration of the privilege of providing services to the Company and my receipt of compensation, if any, now and hereafter paid to me by the Company, I hereby agree to the following:

**(a) Work-for Hire**

(i) To the extent that I create, either before or after the date of this Agreement, recipes, texts, images, designs or other items of a nature that I provide to the Company pursuant to this Agreement, the foregoing shall be collectively referred to herein as "Deliverables."

(ii) The Company is and shall be the sole and exclusive owner of all right, title and interest throughout the world in and to the Deliverables and the results and proceeds thereof, including all patents, copyrights, trademarks, trade secrets and other intellectual property rights (collectively, "Intellectual Property Rights") therein. Deliverables are and shall be "works made for hire" to the greatest extent permitted by applicable law, as defined in Section 101 of the Copyright Act (title 17 of the U.S. Code), and for which I am adequately compensated herein.

**(b) Assignment of Created Content**

(i) If, for any reason, any of the Deliverables do not constitute a work made for hire, I hereby irrevocably assign and transfer to the Company (and its successors and assigns) all of my right, title and interest throughout the world in and to any and all Company Content, including any content created by me or my team for the benefit of or to be used for fractionaltax.com, its various social media channels, or any other related online publications (collectively, "Company Content").

(ii) I hereby irrevocably assign all patent, copyright, trademark, trade secret, database rights, and other intellectual property rights and other proprietary rights therein, including without limitation all granted patents, written content, and all patent applications relating to any such Company creations and all divisions, continuations, continuations-in-part, reissues and extensions of such content or such applications, and the right to claim for such patent or patent applications the full benefits and priority rights under the International Patent Cooperation Treaty, as amended, the Paris Convention for the Protection of Industrial Property, as amended, and any and all other international agreements, treaties or conventions to which the United States adheres and any other applicable international treaty or applicable law, all in each case recognized in the United States, any foreign jurisdiction or under any international treaty regime.

(iii) I hereby waive and irrevocably quitclaim to the Company (and its successors and assigns) any and all claims, of any nature whatsoever, that I now have or may hereafter have for infringement of any and all rights in or to the Company Content.

(iv) I hereby allow the Company to use and exploit, in any manner it deems appropriate, content created by me or my team for any purpose including but not limited to online publication, software and/or technological applications, physical publication in the form of books, booklets, or in any other way it deems appropriate.

**(c) Use of Name, Picture and Video**

(i) I hereby irrevocably assign and allow the Company to use, in its sole discretion, my name, biodata, picture, and/or video in connection with the Intellectual Property and Company Content on any "by line," heading, or on the 'About Us' page. This includes, but is not limited to, the use of my name, biodata, picture, and/or video in related websites, social media channels, newsletters, and email communications or future applications ("apps") or other technologies related to the business of the Company. Notwithstanding the foregoing, the Company is not obligated to credit me with any of the Intellectual Property and Company Content.

(ii) I agree that upon termination of this Agreement, the Company may retain and continue to use my name in work products or contributions I created during my engagement, including but not limited to articles, videos, or other deliverables, as part of the Company' s intellectual property. However, I understand that the Company will remove my name, biodata, and references to my association with the Company from the team page, "About Us" section, or similar materials on its websites and presentation documents. If I discover that my name or biodata remains on the "About Us" page or team page of the Company on any materials or platforms following termination, with the exception of aforementioned deliverables like blog articles or videos made for the Company, I agree to notify the Company in writing and allow the Company thirty (30) business days from the date of notice to investigate and, where appropriate, remove such references.

(d) I represent and warrant to the Company that:

> (i) I have the right to enter into this Agreement, to grant the rights granted herein and to perform fully all of my obligations in this Agreement;
>
> (ii) no other party is required to authorize or consent to my being bound by the terms and conditions hereof;
>
> (iii) my entering into this Agreement with Company and my performance hereunder do not and will not conflict with or result in any breach or default under any other agreement to which I am subject;
>
> (iv) there are no circumstances in which this Agreement and my association with the Company would tend to have a materially adverse effect on the reputation and image of the Company; and

(v) all Intellectual Property rights in and to the Site, the Courses, Mentorships and Company Project Materials belong solely to Company, including ideas, suggestions or contributions thereto which shall be deemed works-for-hire with no requirement of additional consideration or credit.

(e) Company represents and warrants that:

(i) it has the right to enter into this Agreement, to grant the rights granted herein and to perform fully all of its obligations in this Agreement;

(ii) no other party is required to authorize or consent to their being bound by the terms and conditions hereof; and

(iii) entering into this Agreement and performance of Company's obligations do not and will not conflict with or result in any breach or default under any other agreement to which they are each subject.

The parties have executed this Content Assignment and Use of Name Approval Agreement on the respective dates set forth below, to be effective as of the Effective Date first above written.

**{Signature Page – Next Page}**

**The Company:**

**Fractional Tax, Inc.**

**By:** DocuSigned by: Nishchal Basnyat
2064FE8E5EE54A4...

**Name:** Nishchal Basnyat

**Title:** Authorized Signatory

**Address:**
14 Wall Steet, Fl 20
New York, New York 10005

**Date:** 1/7/2025

**Counterparty / Officer:**

**Evan J Cronin CPA & Tax Services**

**By:** Signed by: Evan J Cronin
7ADAA9742A98432...

**Name:** Evan J Cronin

**Title:** Owner

**Address:**
4753 N Magnolia Ave Unit 3
Chicago, IL 60640

**Date:** 1/7/2025